IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| | § | Case No. 3:19-CR-521-K |
| v. | § | |
| | § | |
| HARLEY E. BARNES III (2) | § | |

DEFENDANT'S EMERGENCY MOTION FOR TEMPORARY RELEASE TO HOME
CONFINEMENT BASED UPON DEFENDANT'S HEALTH CONDITION AND THE
COVID-19 PANDEMIC PURSUANT TO 18 U.S.C. SECTION 3142(i)

COMES NOW Harley E. Barnes, III, Defendant, and submits this motion seeking temporary release to home confinement based upon his preexisting medical condition, his current symptoms of being ill, weak, and having shortness of breath, and the real and substantial heath risk and the inability to safely participate in the preparation of his defense without placing himself and his counsel at serious risk of being exposed, which have resulted from the rapidly developing COVID-19 pandemic, and in support thereof would show:

## I. Introduction

Defendant Harley E. Barnes, III respectfully moves the Court for an order granting his release to home confinement, subject to reasonable conditions. Mr. Barnes has been indicted for fraud, a non-violent offense,[1] and is currently detained in the Dallas County Jail, in which 17 individuals have tested positive for the COVID-19 virus as of March 31, 2020.  Furthermore, he

---

[1] On Thursday, April 2, 2020, Chief Judge Barbara Lynn issued Special Order No. 13-10, stating that non-violent defendants who have been ordered to voluntarily surrender to a BOP facility before May 1, 2020 will be granted a 60-day extension to surrender because of the COVID-19 pandemic.

is among the group of people that the Center for Disease Control and Prevention ("CDC") has categorized as the most at-risk for contracting COVID-19.   Most recently, Mr. Barnes has complained of being weak and having shortness of breath.  Counsel for Mr. Barnes has written the Dallas County Jail Administrator and requested that Mr. Barnes be tested as soon as practicable.  The undersigned seeks to mitigate the harm this health crisis will cause incarcerated people, correctional staffs, and the public.  But achieving that goal requires acknowledging that the pandemic is too deadly and too rapid to be mitigated by the normal staffing, litigation, and disposition of criminal cases.  This is a race:  against the disease, and for people's lives.

After holding a detention hearing and issuing an order of detention, the "judicial officer may, by subsequent order, permit the temporary release of the person ... to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i); *United States v. Michaels*, 8:16-cr-76-JVS, Minute Order, dkt. 1061 (C.D. Cal. Mar. 26, 2020) ("Michaels has demonstrated that the Covid-19 virus and its effects in California constitute 'another compelling reason'" justifying temporary release under § 3142(i).).  Here, the current COVID-19 pandemic, as it relates to Mr. Barnes, constitutes a "compelling reason." Specifically, the health risk posed to Mr. Barnes by the COVID-19 pandemic is already heightened because of his advanced age. Moreover, he is currently suffering symptoms of illness, weakness, and shortness of breath.  Furthermore, and perhaps most importantly, the conditions at the Dallas County Jail, in which 17 individuals have tested positive for the COVID-19 virus as of March 31, 2020, increase that already elevated risk.

Additionally, as a result of the drastic measures being taken across the country in response to this pandemic, Mr. Barnes's ability to prepare his defense will be substantially impacted by his continued detention. Specifically, Mr. Barnes will not be able to participate in the preparation of his defense without placing his counsel at risk of exposure to the potentially life-threatening coronavirus. Due to the serious and life-threatening nature of the current health risk to Mr. Barnes, in addition to the need to preserve his ability to prepare his defense without subjecting his counsel to risk of harm, temporary release to home confinement is warranted.

## II.  Factual Background

### A. The Emerging COVID-19 Pandemic

As of Thursday afternoon, April 2, 2020, the number of confirmed coronavirus cases topped 1 million worldwide, Johns Hopkins University researchers found.  "Coronavirus Cases Top 1 million Worldwide, Researchers Say," Fox News (April 2, 2020), https://www.foxnews.com/health/coronavirus-cases-top-1-million-worldwide-johns-hopkins. Specifically, over 1,011,490 cases of COVID-19 were recorded worldwide, with over 52,863 deaths.  The United States has recorded more cases than any other country with 242,182, and it has the third-highest number of deaths in the world with 5,607.  *Id*.  Also on Thursday, April 2, 2020, Chief Judge Barbara Lynn issued Special Order No. 13-10, stating that non-violent defendants who have been ordered to voluntarily surrender to a BOP facility before May 1, 2020 will be granted a 60-day extension to surrender because of the COVID-19 pandemic.

The CDC has issued guidance advising that individuals at higher risk of contracting COVID-19—older adults and people with chronic medical conditions—take immediate preventative actions, including avoiding crowded areas and staying home as much as possible. See *People at Risk for Serious Illness from COVID-19*, CDC (Mar. 12, 2020), https://bit.ly/2vgUt1P.

## B. Conditions of Confinement and Spread of COVID-19

According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe," resulting in the unavoidable reality that infection control is exceedingly difficult in these settings. *See* "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (Mar. 2, 2020), https://bit.ly/2W9V6oS. In other words, as set forth below, the conditions of Mr. Barnes's current pretrial detention present an alarmingly ideal environment for the spread of COVID-19, especially in a jail population that as of March 31, 2020, houses 17 confirmed cases of COVID-19.

*Close Quarters Akin to a Cruise Ship or Nursing Home*

Much like the close quarters and confined nature of cruise ships and nursing homes, which have been shown to lead to rapid and extensive spread of the illness, the Bureau of Prisons has observed that the "densely packed nature of prisons creates a risk of infection and

transmission for inmates and staff."    See Danielle Ivory, "We Are Not a Hospital": A Prison Braces for the Coronavirus, THE NEW YORK TIMES (Mar. 17, 2020), https://www.nytimes.com/2020/03/17/us/coronavirus-prisons-jails.html.

Comparatively, however, jails and prisons are just "as dangerous as nursing homes and cruise ships, but far less sanitary." See Jim Mustian and Joshua Goodman, Get Out of Jail? Inmates Fearful of Virus Argue for Release: America's nearly 7,000 jails, prisons and correction facilities are an ideal breeding ground for the virus, NBC DFW (Mar. 18, 2020), https://www.nbcdfw.com/news/coronavirus/get-out-of-jail-inmates-fearful-of-virus-argue-for-release/2333217/.

Likewise, many prisoners lack regular access to critical sanitary resources, such as hand-washing, hand sanitizer, and showers. Other conditions, such as "the fact that ventilation behind bars is often poor, inmates sleep in close quarters and share a small number of bathrooms," further exacerbate the situation. *Id.* In short, jails and prisons constitute a perfect environment for the transmission of contagious disease, such as COVID-19.  See Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, https://doi.org/10.1086/521910.

*Inability to Institute Protective Measures Urged by CDC*

Even aside from the unsanitary conditions, jails and prisons simply don't have the ability to put into place the critical prevention methods urged by the CDC – staying six feet away from others, frequently washing hands, and routinely disinfecting surfaces. For instance, as one

correctional officer pointed out, you "can't escort an inmate with a six-foot rule."  Ivory, *supra* note 6. Thus, the increasingly important practice of "social distancing" is simply impossible in the context of jails and prisons. Rather, even in spite of recent efforts such as cessation of visitation in many facilities, it is inescapable that countless individuals come and go from jails and prisons each day. Inmates cycle in and out of detention facilities from all over the state and country, particularly in local jails (such as the Dallas County Jail), which serve as an initial holding facility for many newly arrested individuals. Likewise, correctional officers, the facility's medical providers, and other essential staff come in and out each day, potentially with limited or no screening.

*Lack of Access to Medical Care or Supplies*

Much like the significantly limited access to sanitary measures, jails and prisons simply do not have the ability to provide the life-saving medical treatment that is often required in severe cases of COVID-19. Many of these facilities, where medical care is limited even at the best of times, simply do not have enough beds or sufficient staff to treat and/or quarantine the substantial number of patients that an outbreak would surely produce. See Laura M. Maruschak et al. (2015). Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12. NCJ 248491. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

Likewise, many jails and prisons are facing severe shortages of critical protective equipment and supplies such as masks and gloves, leaving staff members exposed to a substantially increased risk.  At least one Texas staff member of the federal prison system has

reported to the New York Times that their facilities are "ill-prepared for a coronavirus outbreak, or even a quarantine." See Ivory, supra note 6.   Specifically, that staff member reported that "medical supplies and staff were short, even without an outbreak" and that they "don't have ventilators on hand at all," concluding that "the prison simply would not be able to handle a surge." *Id.*

As such, experts have warned that the "abrupt onset of severe covid-19 infections among incarcerated individuals will require mass transfers to local hospitals for intensive medical and ventilator care – highly expensive interventions that may soon be in very short supply." See Josiah Rich, Scott Allen, and Mavis Nimoh, We Must Release Prisoners to Lessen the Spread of Coronavirus, THE WASHINGTON POST (Mar. 17, 2020), https://www.washingtonpost.com/ opinions/2020/03/17/we-must-release- prisoners-lessen-spread-coronavirus/.

*Significant Numbers of High-Risk Prisoners*

Jails and prisons house a significant number of prisoners who are among those which the CDC has identified as most susceptible to falling severely ill with COVID-19, including the elderly and people with underlying medical conditions. See *Joint Statement from Elected Prosecutors on COVID-19 and Addressing the Rights and Needs of Those in Custody* (Mar. 2020).

In fact, "[m]ore than 20% of the Texas prison population is over the age of 50, the most at-risk populations when it comes to the new coronavirus." See Jessica Priest, *Coronavirus in Texas: Prison Population at Risk of Outbreak*, STATESMAN (Mar. 14, 2020), https://

www.statesman.com/news/20200314/coronavirus-in-texas-prison-population-at-risk-of-outbreak.

Additionally, data from the outbreak in China appears to show that "[m]en have died from coronavirus at nearly twice the rate of women," which is significant considering that the vast majority of prisoners are male.  See Dennis Thompson, Coronavirus Strikes Men, Older People the Hardest, HEALTHDAY REPORTER (Feb. 28, 2020), https://www.usnews.com/news/health-news/articles/2020-02-28/coronavirus-strikes-men-older-people-the-hardest.

Taking into account these various factors, particularly when considered together, it appears highly likely that the close-quarters, unsanitary nature of jails and prisons, where available medical care and precautionary measures are notably limited, will inevitably prove to be a dangerous breeding ground for COVID-19.

## C. Growing Precedent of Jailhouse Outbreaks

The spread of contagious disease in jails and prisons is not a novel issue. For example, outbreaks of the flu occur regularly, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases. See Prisons and Jails are Vulnerable to COVID-19 Outbreaks, THE VERGE (Mar. 7, 2020) https://bit.ly/2TNcNZY.  What is novel, however, is the much more aggressive and uncontrollable nature of the current pandemic. Unlike the flu, this illness has no vaccine and is spreading at an alarmingly higher rate. In China, officials have confirmed the coronavirus spreading at a rapid pace through Chinese prisons, counting more than 500 cases.  See Rhea Mahbubani, Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials, BUSINESS INSIDER (Feb. 21, 2020), https://bit.ly/2vSzSRT.

Iran is facing a similar crisis, prompting Secretary of State Mike Pompeo to call for the release of Americans detained there in light of the "deeply troubling" "[r]eports that COVID-19 has spread to Iranian prisons," noting that "[t]heir detention amid increasingly deteriorating conditions defies basic human decency." See Jennifer Hansler and Kylie Atwood, Pompeo Calls for Humanitarian Release of Wrongfully Detained Americans in Iran Amid Coronavirus Outbreak, CNN (Mar. 10, 2020) https://cnn.it/2W4OpV7.

In response to the outbreak of COVID-19 throughout its prisons, Courts across Iran have granted 85,000 inmates furlough as one of the numerous measures taken in an attempt to contain the spread of coronavirus across the country. See Claudia Lauer and Colleen Long, *US Prisons, Jails On Alert for Spread of Coronavirus*, THE ASSOCIATED PRESS (Mar. 7, 2020) https://apnews.com/af98b0a38aaabedbcb059092db356697. The significance of that decision is all the more evident when considered in light of the fact that Iran had a total of 189,500 people in prison prior to these releases, according to January report. See Parisa Hafezi, *Iran Temporarily Frees 85,000 from Jail Including Political Prisoners*, REUTERS WORLD NEWS (Mar. 17, 2020).

Across the United States, numerous jurisdictions have already begun taking steps to reduce jail and prison populations, with the goal of minimizing the inevitable spread of COVID-19 amongst incarcerated individuals. See, *Jails Release Prisoners, Fearing Coronavirus Outbreak Experts Say Virus Could Spread Quickly in Crowded Correctional Facilities, which are also banning visitors and restricting inmates' movements* https://www.wsj.com/articles/jails-release-prisoners-fearing-coronavirus-outbreak-11584885600.

In a recently issued joint statement, numerous elected prosecutors, including Dallas County District Attorney John Creuzot, have urged that the current pandemic presents a "pressing need ... to dramatically reduce the number of incarcerated individuals." *Joint Statement from Elected Prosecutors on COVID-19*, *supra* note 14. Among other steps, Creuzot and others have advocated for the release of elderly and otherwise susceptible prisoners "immediately, unless doing so would pose a serious risk to the physical safety of the community." *Id.*

The Supreme Court of Washington recently issued an emergency order addressing the growing crisis that is the COVID-19 pandemic, ordering that "Courts shall hear motions for pretrial release on an expedited basis without requiring a motion to shorten time," and perhaps even more importantly, finding that "for those identified as part of a vulnerable or at-risk population by the Centers for Disease Control, COVID-19 is presumed to be a material change in circumstances, and the parties do not need to supply additional briefing on COVID-19 to the court." See *In The Matter Of Statewide Response By Washington State Courts To The Covid-19 Public Health Emergency*, Order No. 25700-B-606, at 6 (Sup. Ct. Wash., Mar. 18, 2020).

Many law enforcement officials have enacted similar measures to reduce jail populations, including by discouraging the admission of individuals arrested on non-violent charges. In New York, Brooklyn District Attorney Eric Gonzalez, joined by public health experts, has asked the Governor to grant emergency clemencies to elderly and sick prisoners. *See* Sarah Lustbader, *Coronavirus: Sentenced to COVID-19*, THE DAILY APPEAL (Mar. 12, 2020), https://theappeal.org/sentenced-to-covid-19/.

In Cuyahoga County, Ohio, more than 200 inmates have been released amid concerns over COVID-19. See Allen Kim and Anna Sturla, *Cities in the US Move to Lower Inmate Populations as Coronavirus Fears Grow*, CNN (Mar. 16, 2020), https://www.cnn.com/2020/03/16/us/inmates-released-jail-coronavirus-trnd/index.html. Regarding that decision, Administrative Judge Sheehan explained that they "are trying to make as much room as possible, so when this virus hits [thei]r jail, the jail can deal with these people, quarantine them and deal with it instead of letting them sit there and infect the whole entire jail." Id. Los Angeles County has followed suit, announcing plans to release inmates early and reduce their number of arrests. Id. Likewise, Collin County has enacted similar measures, urging law enforcement not to arrest non-violent or petty offenders, so as to reduce already high jail populations. *See Facing Coronavirus Concerns, Collin County Sheriff Asks Police Not to Bring Petty Criminals to Jail*, THE DALLAS MORNING NEWS (Mar. 12, 2020), https://www.dallasnews.com/news/public-health/2020/03/12/facing-  coronavirus-concerns-collin-county-sheriff-asks-police-not-to-bring-petty-criminals-to-jail/.

**D. Disastrous Consequences of Inadequate Preventative Measures**

With respect to jails and prisons, in particular, the importance of taking sufficient preventative measures now is underscored by the frightening possibility that, in the event of any significant outbreak, they could very likely be facing a significant number of infected correctional officers and staff who are thus unable to work. Accordingly, Dr. Marc Stern, a physician and former top medical officer for the Washington State Department of Corrections, has urged that "jails and prisons should be planning for the possibility of not having enough

staff," explaining that we "don't want to find one day that a number of officers have called in sick, and we're having trouble managing the institution."   See Martin Kaste, *Prisons And Jails Worry About Becoming Coronavirus 'Incubators'*, NPR (Mar. 13, 2020), https://www.npr.org/ 2020/03/13/815002735/prisons-and-jails-worry-about-becoming-coronavirus-incubators.

Additionally, the success of "social distancing" practices is largely tied to the percentage of the population that is abiding by said practices, *i.e.* the more complete the participation, the more effective the practice. Thus, by placing the Defendant in home confinement where he can be completely cut off from outside access, the likelihood of "flattening the curve" becomes that much stronger. In short, although "corrections facilities cannot be closed, they must be included in any plan aimed at slowing the surge in infections and protecting public safety." Josiah Rich, Scott Allen, and Mavis Nimoh, *supra* note 14. A critical component of including these facilities in such plans is reducing the overall number of prisoners, particularly those who are most at-risk.

### III.  The Bail Reform Act Permits Mr. Barnes's Release

A "judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). In this case, the global COVID-19 pandemic spreading rapidly through the Dallas County Jail warrants reconsideration of Mr. Barnes's detention. Specifically, the severe, potentially life-threatening health risk posed by the COVID-19 pandemic to an older individual such as Barnes, who is currently housed in a jail facility that has 17 confirmed cases of COVID-19, who currently exhibits symptoms of being ill,

weak, and having shortness of breath, and who has significant underlying recent medical conditions, constitutes a compelling reason to authorize his temporary release to strict home confinement.

In light of the crucial liberty interests involved, it therefore follows that a "case-by-case" approach is required at any stage of the case in assessing the propriety of pretrial detention. *See United States v. Gonzales Claudio*, 806 F.2d 334, 340 (2d Cir. 1986) (discussing due process analysis for evaluating propriety of prolonged pretrial detention, and the interests at stake) (citations omitted), *cert. dismissed sub nom.*, *Melendez-Carrion v. United States*, 479 U.S. 978 (1986). In conducting such an analysis, courts are to consider the "total harm and benefits to prisoner and society" that continued pretrial imprisonment would yield in the context of the particular circumstances at issue in a given case, such as the rapidly encroaching COVID-19 pandemic here. *See Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring) (calling for heightened judicial scrutiny of the projected impact of jail and prison conditions on a defendant).

*The COVID-19 Pandemic Constitutes a Compelling Reason*

The potential harm to society which could result from Mr. Barnes's continued detention is quite severe. Without critical measures such as reducing incarcerated populations (which can be achieved by releasing at-risk, non-violent individuals, such as Mr. Barnes), "the novel coronavirus will spread rapidly in our jails and prisons, endangering not only prisoners and corrections workers but the general public as well." *Id.*  Importantly, that danger consists of more than simply the increased exposure and spread that would result from correctional officers going

back and forth between detention facilities and the community. That danger also entails the undoubted need for prisoners to be transported to hospitals to receive life-saving treatments not available in jails or prisons, such as ventilators, thereby reducing the availability of these treatments to the public and increasing demand on these already scarce resources. *Id.*

As a result of these ever-increasing risks, combined with the highly susceptible nature of the Dallas County Jail to an outbreak of this highly contagious illness, the current pandemic constitutes a very compelling reason for Mr. Barnes's temporary release. In fact, the critical nature of this pandemic, and in particular its impact in the context of a crowded detention facility, has been recognized by other courts. *See, e.g., Xochihua-James v. Barr*, No. 18-71460 (9th Cir. Mar. 23, 2020) (unpublished) (*sua sponte* releasing detainee from immigration detention "[I]n light of the rapidly escalating public health crisis"); *United States v. Michaels*, 8:16-cr-76-JVS, Minute Order, dkt. 1061 (C.D. Cal. Mar. 26, 2020) ("Michaels has demonstrated that the Covid-19 virus and its effects in California constitute 'another compelling reason'" justifying temporary release under § 3142(i).); *United States v. Jaffee*, No. 19-cr-88 (D.D.C. Mar. 26, 2020) (releasing defendant with criminal history in gun and drug case, citing "palpable" risk of spread in jail and "real" risk of "overburdening the jail's healthcare resources"; "the Court is. . . convinced that incarcerating the defendant while the current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement"); *United States v. Harris*, No. 19-cr-356 (D.D.C. Mar. 26, 2020 ("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on…strict conditions."); *United States v. Garlock*, No. 18-CR-00418-VC-1, 2020

WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) (citing "chaos" inside federal prisons in sua sponte

extending time to self-surrender: "[b]y now it almost goes without saying that we should not be

adding to the prison population during the COVID-19 pandemic if it can be avoided"); *United

States v. Perez*, No. 19 CR 297 (PAE), 2020 WL 1329225, at *1 (S.D.N.Y. Mar. 19, 2020)

(releasing defendant due to the "heightened risk of dangerous complications should he contract

COVID-19"); *United States v. Stephens*, 2020 WL 1295155, __F.Supp. 3d __ (S.D.N.Y. Mar. 19,

2020) (releasing defendant in light of "the unprecedented and extraordinarily dangerous nature of

the COVID-19 pandemic"); *In re Manrigue*, 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020 ("The

risk that this vulnerable person will contract COVID-19 while in jail is a special circumstance

that warrants bail."); *In re Request to Commute or Suspend County Jail Sentences*, Docket No.

084230 (N.J. Mar. 22, 2020 (releasing large class of defendants serving time in county jail "in

light of the Public Health Emergency" caused by COVID-19); *see also United States v. Avenatti*,

No. 8:19-cr-61 (C.D. Cal. Mar. 25, 2020) (*sua sponte* inviting defendant to move for

reconsideration of a just-denied motion for release "[i]n light of the evolving nature of the

Covid-19 pandemic"); *United States v. Matthaei*, No. 1:19-CV-00243-BLW, 2020 WL 1443227,

at *1 (D. Idaho Mar. 16, 2020) (extending self-surrender date by 90 days in light of COVID-19);

*United States v. Barkman*, 2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020) (suspending

intermittent confinement because "[t]here is a pandemic that poses a direct risk if Mr.

Barkman…is admitted to the inmate population of the Wahoe County Detention Facility");

*United States v. Copeland*, No. 2:05-CR-135-DCN (D.S.C. Mar. 24, 2020) (granting

compassionate release to defendant in part due to "Congress's desire for courts to release

individuals the age defendant is, with the ailments that defendant has during this current

pandemic"); *Basank v. Decker*, No. 20-CV-2518 (S.D.N.Y. Mar. 26, 2020) ("[t]he nature of detention facilities makes exposure and spread of the [coronavirus] particularly harmful" so granting TRO and releasing high-risk plaintiffs); *Coronel v. Decker,* 20-CV-2472-AJN, Dkt. No. 26 (mar. 27, 2020) (granting TRO and releasing from immigration detention facility in light of COVID-19); *United States v. Raihan*, No. 20-cr-68-BMC, Dkt. No. 20 at 10:12–19 (E.D.N.Y. Mar. 12, 2020) (deciding to continue a criminal defendant on pretrial release rather than order him remanded to the Metropolitan Detention Center due, in part, to the Magistrate Judge's recognition of the fact that "[t]he more people we crowd into that facility, the more we're increasing the risk to the community").

By allowing Mr. Barnes – a particularly vulnerable individual over age 60 with significant recent health issues who is currently experiencing body aches and shortness of breath while being confined in a jail population that has 17 confirmed cases of COVID-19  – to be released to home confinement, the Dallas County Jail would be one step closer to having sufficient resources to be able to deal with an almost certainly imminent COVID-19 outbreak, and the public would likewise be one step closer to achieving the necessary level of participation in "social distancing" to allow for a "flattening of the curve" and eventual control over the outbreak.

With respect to Mr. Barnes, the potential harm of continued pretrial detention is quite simple – the increasingly likely risk that he will contract the highly contagious coronavirus, which could very likely prove severe and life-threatening, considering his status among those most vulnerable, not to mention the increased risk posed by the conditions of his detention. At

the September 20, 2019 hearing on the Government's motion to revoke Mr. Barnes' pretrial release, the Court received evidence that Mr. Barnes suffered a stroke in June 2019, and was at the time of the hearing still under post-stroke medical care.  In the face of a highly contagious pandemic, that is precisely the type of circumstance that puts prisoners at a dramatically increased risk. Moreover, news reports indicate that at least one BOP staff member in Grand Prairie, Texas has tested positive for the coronavirus, further underscoring the imminent nature of this threat.  Jim Mustian and Joshua Goodman, *supra* note 7.

Notably, United States District Judge Allison J. Nathan has recently recognized the compelling nature of the current health risk, noting that "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic has become apparent," and granting a defendant's motion for temporary release to home confinement based, in part, on that growing pandemic, which the court found to constitute a "compelling reason." *United States v. Stephens*, No. 15-cr-95, at 1 (S.D.N.Y., Mar. 18, 2020). The court emphasized the importance of this "compelling reason," noting that "even if [it] were to conclude that changed circumstances did not compel reconsideration of the Defendant's bond conditions, [the] separate statutory ground advanced by the Defendant [(18 U.S.C. § 3142(i))] would require his release here." *Id.* at 4.  Moreover, in the Temporary Release Order issued in *Michaels*, United States District Judge James V. Selna noted that Michaels "is of an age and has medical conditions that place him in the group most susceptible to COVID-19 … [and he] has demonstrated that the Covid-19 virus and its effects in California constitute 'another compelling reason'" justifying temporary release under § 3142(i). *United States v. Michaels*, 8:16-cr-76-JVS, Minute Order, dkt. 1061 (C.D. Cal. Mar. 26, 2020).

*Release Is Necessary to Avoid Severe Health Risk to Mr. Barnes's Counsel*

In addition to posing a significant health risk to Mr. Barnes, the COVID-19 pandemic has also resulted in such a dramatically restricted state of affairs as to render it impossible for him to participate in the preparation of his defense without subjecting his counsel to a very real and imminent risk of harm. In light of the current measures being taken in Dallas County (and across the country) pursuant to state of emergency declarations, namely the current prohibition of any gatherings over ten (10) people and calls for strict observation of "social distancing," the risks associated with Mr. Barnes's counsel traveling to the Dallas County Jail to visit him are simply too high to bear.   This is especially important since the Dallas County Jail has 17 confirmed cases of COVID-19.

Not only would such visits pose a significant risk to the health of Mr. Barnes's counsel in the sense that it would force them to violate the current "social distancing" protocols, but more importantly, it would also force them to spend hours at a time in the Dallas County Jail visiting facilities, which have undoubtedly not been sufficiently sanitized. Considering that the virus can survive on plastic and steel for up to 72 hours, effective cleaning is near impossible without constant attention, meaning that those facilities are highly likely to be infected with the virus. See Apoorva Mandavilli, *How Long Will Coronavirus Lice on Surfaces or in the Air Around You?*, THE NEW YORK TIMES (Mar. 17, 2020), https://www.nytimes.com/2020/03/17/health/coronavirus-surfaces-aerosols.html.

In other words, to do so would be akin to boarding a cruise ship without any protective gear or precautions. Moreover, by visiting the Dallas County Jail, Mr. Barnes's counsel would be

further increasing the risk to Mr. Barnes, as well as all of the other inmates and staff in that facility, by increasing contact with the outside population and potentially passing on the virus.

Under these exceptional circumstances, release to home confinement is necessary in order to allow Mr. Barnes to participate in the preparation of his defense without placing his counsel at risk. In fact, in the aforementioned order issued by District Judge Allison in *United States v. Stephens*, the court recognized this issue as a valid "compelling reason" for a defendant's temporary release, specifically citing "the obstacles the current public health crisis poses to the preparation of the Defendant's defense" in reaching its conclusion that the defendant's temporary release was warranted on the basis of a compelling reason under 18 U.S.C. § 3142(i). *Id.* at 5.

Taking into account the benefits which would accrue not only to Mr. Barnes, but to the community (in the form of increased "social distancing" participation) and to the Dallas County Jail (in the form of progress towards a sufficiently reduced population so as to enable a reasonable ability to combat the spread of COVID-19), as well as the importance of his ability to participate in his defense without placing his counsel at risk of harm, Mr. Barnes's temporary release to home confinement is warranted, subject to the conditions set out below.

### IV.  Conditions of Release Are Available that Would Allow Mr. Barnes to Be Treated Humanely While Also Ameliorating Any Danger to the Community

From Mr. Barnes's perspective, the current circumstances present a dramatically different scenario from that which existed at the time of his detention, in the sense that *his very life is on the line*. His potential release to home confinement is no longer a matter of comfort or

convenience, but rather one of a life-threatening nature. As a result, Mr. Barnes is well aware that if he were to violate any condition of release, he would not only be forfeiting his liberty, but would be forfeiting his best possible hope of avoiding this highly contagious and potentially deadly outbreak. This imminent and very real risk of contracting the potentially fatal coronavirus serves as a powerful incentive to abide by any conditions, which, in addition to the other changes discussed below, results in a substantially different calculus than was previously present in this case as to Mr. Barnes's likelihood of abiding by his conditions.

Accordingly, Mr. Barnes respectfully submits that the following conditions would be sufficient, but not greater than necessary, to ensure his presence and the safety of the community:

1. **Home Detention with GPS Monitoring**: The Defendant shall be subject to Home Detention with GPS Monitoring, restricting him to the confines of his residence at all times except for urgent medical treatment, court appearances, court-ordered obligations, or other activities approved in advance by the pretrial office or supervising officer;

2. **No Internet Use**: The Defendant shall not access the internet for any purpose, including the use of any email account, and shall comply with any and all monitoring requirements employed or imposed by the United States Probation Department to ensure compliance with such restrictions;

3. **Prior Conditions**: The Defendant shall be subject to all previously ordered conditions of release; and

4. **Additional Conditions**: The Defendant shall be subject to any and all other conditions which the Court determines to be appropriate.

These conditions, with the inclusion of the requirement that Mr. Barnes abstain from any use of the internet through available monitoring software with USPO, would address any previous concerns that he might attempt to engage in any conduct relating to the sale of securities in that this condition would eliminate the only means through which he could hypothetically do so.

For the reasons set forth above, Mr. Barnes respectfully submits that in light of these significantly changed circumstances, the foregoing conditions of release to home confinement would be sufficient, but not greater than necessary, to reasonably assure his appearance as required and the safety of any other person and the community." *United States v. Fortna*, 769 F. 3d 243, 250 (5th Cir. 1985).

### V. Conclusion

Mr. Barnes is charged with fraud.  He is not charged with a violent crime.  Aside from a misdemeanor DWI, he has no criminal history.  He is currently being confined to a jail facility that just 48 hours ago reported 17 positive cases of COVID-19.[2]   Mr. Barnes is among the especially vulnerable population facing a heightened risk not only of contracting the coronavirus, but also of developing a severe, even life-threatening case if he were to become infected. As a result, if subjected to continued pretrial detention amid the onset of this novel and aggressive

---

[2] That number has since increased at the time of this filing.  By how much?  Unfortunately Mr. Barnes will have to wait and see.

pandemic, Mr. Barnes would face a very real risk of life-threatening illness while being held in a facility that is simply not equipped to address such an outbreak. This risk far exceeds any reasonable or ordinary condition of detention and constitutes a compelling reason for Mr. Barnes's temporary release to strict home confinement with GPS monitoring, subject to additional conditions. For each of these reasons and all of those set forth above, Mr. Barnes respectfully requests that he be temporarily released to temporary home confinement with GPS monitoring until the significant health risk posed by the current COVID-19 pandemic has passed.

Respectfully submitted,

/s/ *Barry Keith Gore, Jr.*
Barry Keith Gore, Jr.
SBOT NO. 24002164
2301 Virginia Parkway
McKinney, Texas 75071
972-529-2220 (O)
972-562-2839 (F)
Keith@KeithGore.com
Attorney for Defendant Barnes

CERTIFICATE OF CONFERENCE

On April 3, 2020, I conferred via email with Assistant U.S. Attorney Amanda Vaughn, who advised the Government opposes this motion.

/s/ *Barry Keith Gore, Jr.*
Barry Keith Gore, Jr.

<u>CERTIFICATE OF SERVICE</u>

I certify that a copy of this document was delivered to all counsel of record by electronic transmission on the date of filing same with the Clerk of the court.

<u>/s/ *Barry Keith Gore, Jr.*</u>
Barry Keith Gore, Jr.