1               IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF TEXAS

3                        DALLAS DIVISION

4
   UNITED STATES OF AMERICA,     )        3:19-CR-112-K-3
5              Government,        )
                                  )
6                                 )
   VS.                            )        DALLAS, TEXAS
7                                 )
                                  )
8  HARLEY E. BARNES III,          )
               Defendant.         )        March 1, 2023
9

10                 TRANSCRIPT OF SENTENCING HEARING

11              BEFORE THE HONORABLE ED KINKEADE

12                 UNITED STATES DISTRICT JUDGE

13

14   A P P E A R A N C E S:

15

16
     FOR THE GOVERNMENT:          MR. THEODORE M. KNELLER
17                                U.S. Department of Justice
                                  Criminal Division, Fraud Section
18                                1400 New York Avenue NW
                                  Bond Building
19                                Washington, DC  20005
                                  (202) 514-5799
20                                theodore.kneller@usdoj.gov

21
                                  MS. MARY F. WALTERS
22                                U.S. Attorney's Office
                                  1100 Commerce Street
23                                Third Floor
                                  Dallas, Texas  75242
24                                (214) 659-8685
                                  mary.walters@usdoj.gov

25

```
 1                                    MS. BEVERLY KRISTYNE CHAPMAN
                                      U.S. Attorney's Office
 2                                    1100 Commerce Street
                                      Third Floor
 3                                    Dallas, Texas  75242
                                      (214) 659-8747
 4                                    beverly.chapman@usdoj.gov

 5
       FOR THE DEFENDANT:             MR. CODY L. SKIPPER
 6                                    Law Office of Cody L. Skipper
                                      2001 Bryan Street
 7                                    Suite 1905
                                      Dallas, Texas  75201
 8                                    (214) 850-9229
                                      cody@skipperdefense.com
 9
10                                    MR. BARRY KEITH GORE, JR.
                                      Keith Gore, Lawyer
11                                    2301 Virginia Parkway
                                      McKinney, Texas  75071
12                                    (972) 529-2220
                                      keith@keithgore.com
13
14                                    MR. JOHN F. GUSSIO III
                                      Law Office John F. Gussio III
15                                    3131 McKinney Avenue
                                      Suite 800
16                                    Dallas, Texas  75204
                                      (214) 740-9955
17                                    john@gussiolaw.com
18
       COURT REPORTER:                MR. TODD ANDERSON, RMR, CRR
19                                    United States Court Reporter
                                      1100 Commerce St., Rm. 1625
20                                    Dallas, Texas  75242
                                      (214) 753-2170
21

22

23          Proceedings reported by mechanical stenography and

24     transcript produced by computer.

25
```

```
 1              SENTENCING HEARING - MARCH 1, 2023
 2                    P R O C E E D I N G S
 3         THE COURT:  Case of United States of America versus
 4    Harley Barnes, Cause Number 3:19-CR-112-K.
 5         Mr. Christopher Fenton, who is formerly a Washington,
 6    D.C., now down here permanently, apparently.
 7         MR. KNELLER:  Not Mr. Fenton, Your Honor.
 8         MS. WALTERS:  But Mr. Kneller.
 9         MR. KNELLER:  Mr. Kneller.
10         THE COURT:  I meant Kneller.
11         MS. WALTERS:  Yes.
12         THE COURT:  I called you Fenton, didn't I?  Sorry.
13         MR. KNELLER:  That's all right.
14         THE COURT:  And Ms. Walters, who does live here.
15         MS. WALTERS:  Yes.
16         And also joining us today, Your Honor, is Beverly
17    Chapman of our office.
18         THE COURT:  Ms. Chapman, good to have you here.
19         MS. CHAPMAN:  Good morning, Your Honor.
20         THE COURT:  Is this your first time to work on one of
21    these?
22         MS. CHAPMAN:  It is not.
23         (Discussion off the record)
24         THE COURT:  And, Mr. Kneller, sorry I called you
25    Mr. Fenton.
```

```
 1              MR. KNELLER:  Not a problem, Your Honor.

 2              THE COURT:  I won't do it again.

 3              Okay.  All right.  And y'all are ready.

 4              And then representing Mr. Barnes, Mr. Skipper, you're

 5    here and you're ready?

 6              MR. SKIPPER:  Good morning.

 7              THE COURT:  Good to see you, Mr. Skipper.

 8              MR. SKIPPER:  Good to see you.

 9              And then I'm here along with Mr. Keith Gore and John

10    Gussio, Your Honor.

11              THE COURT:  Oh, good to see y'all.

12              MR. GORE:  Good morning.

13              MR. GUSSIO:  Good morning.

14              THE COURT:  All right.  Appreciate y'all helping

15    Mr. Skipper.

16              Mr. Skipper, how many years ago did you clerk down

17    here?

18              MR. SKIPPER:  2003.  Twenty.  Twenty years.

19              THE COURT:  That's been a few years ago.

20              MR. SKIPPER:  Been a few years.  It was a lot of fun.

21              THE COURT:  We're glad to have you back.

22              MR. SKIPPER:  Glad to be back.

23              THE COURT:  All right.  Mr. Barnes?

24              THE DEFENDANT:  Yes, Your Honor.

25              THE COURT:  On June 7, 2000 -- if you can't stand --
```

 1  is there something wrong with you physically?

 2          THE DEFENDANT:  I don't have any strength in my left

 3  side.

 4          THE COURT:  You what?  I'm sorry?

 5          THE DEFENDANT:  I don't have any strength in my left

 6  side.

 7          THE COURT:  Okay.  Well, if you can't stand, you can

 8  sit down during this if it --

 9          THE DEFENDANT:  I can -- I can stand up okay.

10  Just --

11          THE COURT:  Okay.  I'm not going to ask you to run a

12  mile or anything.  You just stand there, okay?

13          THE DEFENDANT:  Thank you.

14          THE COURT:  All right.  You pled guilty before United

15  States Magistrate Judge Rebecca Rutherford to Counts One

16  through Twenty-One and Twenty-Three of a 23-count superseding

17  indictment to conspiracy to commit mail and wire fraud in Count

18  One; and Counts Two through Eleven, mail fraud; and Counts

19  Twelve through Twenty-One, wire fraud.  Excuse me.  And Count

20  Twenty-Three, money laundering and aiding and abetting.

21          And I accepted your guilty plea on June 22, 2022.

22          And I will dismiss the original indictment as to you

23  today.

24          We have an offense level 43, criminal history

25  category I, a guideline range of a long time in Counts One,

 1   Twenty-One, and Twenty-Three of 5,160 months.  A statutory --
 2   that's it.  Okay.
 3              And let me ask you this.  Have y'all reached any kind
 4   of agreement on the restitution, Mr. Skipper?
 5              MR. SKIPPER:  Your Honor, we -- yes, we -- as far
 6   as --
 7              THE COURT:  Is that the $10 million?
 8              MR. SKIPPER:  The amount is the $10 million.
 9              THE COURT:  Okay.
10              MR. SKIPPER:  It's a bit reduced more than the
11   others, Your Honor.  Yes, sir.
12              THE COURT:  Okay.  And so restitution in this case --
13   and both sides have agreed -- is $10,168,575.21.
14              Is that correct, Mr. Skipper?
15              MR. SKIPPER:  Yes, Your Honor.
16              And this morning we did -- I did give to Ms. Chapman
17   the document to go ahead and expedite that any further moneys
18   be paid directly and not go through the forfeiture -- have no
19   delay.
20              THE COURT:  Okay.
21              MR. SKIPPER:  I don't know what that document is
22   titled, but Mr. Barnes certainly agreed to do that.
23              MS. CHAPMAN:  Yes, Your Honor.  The items listed in
24   the indictment as subject to forfeiture, that Mr. Barnes agreed
25   was subject to forfeiture in his plea agreement, we are instead

1    going to directly apply those funds to restitution.

2            Mr. Barnes has agreed to that.  And Mr. Comu also

3    separately agreed to waive his interest in those funds.

4            So we intend to file that motion at some point this

5    week with the Court.

6            THE COURT:  Okay.  And these were all cash accounts,

7    I'm assuming?

8            MS. CHAPMAN:  Yes, Your Honor.

9            THE COURT:  Okay.

10           MS. CHAPMAN:  In the name of -- there are various

11   businesses that were --

12           THE COURT:  How much money is it?

13           MS. CHAPMAN:  About $240,000.00.

14           THE COURT:  Well, good.  That's -- at least that's a

15   start.  All right.

16           MR. SKIPPER:  And also, Your Honor, just -- just a

17   point of clarification, Mr. Barnes also had submitted already

18   through Mr. Gore $36,000.00 to the registry of the court before

19   today.

20           THE COURT:  Okay.  And the Government agrees to that?

21           MS. CHAPMAN:  Yes, Your Honor.

22           THE COURT:  All right.  Great.  So whatever that

23   totals up.  We've got some restitution paid.

24           Now, you've got a number of objections and

25   clarifications.  Do you want to go over those, or how do you

```
 1    want to do it?
 2             MR. SKIPPER:  Your Honor, I do not want to go back
 3    over those.
 4             THE COURT:  All right.
 5             MR. SKIPPER:  I've discussed them with Mr. Barnes.
 6    He's familiar with them.  The majority are clarifications which
 7    have no impact on the guidelines.  The other two this Court has
 8    already ruled on with Mr. Comu.  And just to expedite this, we
 9    would just address, if that's okay with the Court.
10             THE COURT:  Oh, sure.
11             MR. SKIPPER:  And then we could just move to the
12    appropriate sentence.
13             I don't have any family here.  I did submit four
14    letters on behalf of Mr. Barnes.
15             THE COURT:  You did, and I have those.  I appreciate
16    that.
17             MR. SKIPPER:  And I know --
18             THE COURT:  So I don't remember how I ruled in that
19    other guy's case.
20             MR. SKIPPER:  They were overruled.  I mean, they were
21    obviously seriously considered by the Court.
22             THE COURT:  Then I -- and on the clarifications, I'm
23    assuming the Government doesn't have any objection to those
24    clarifications?
25             MR. KNELLER:  No objections to those clarifications,
```

1    Your Honor.

2          THE COURT:  Okay.  Then I'll grant those, but

3    otherwise I overrule your objections.

4          Okay.  So I'm ready to hear -- I do accept, then,

5    with those clarifications the findings of the Probation

6    Department as the findings of the Court.

7          And you've got a -- the Government has got a

8    sentencing memorandum, and the Defendant has a sentencing

9    memorandum.

10          The Government is wanting me to assess punishment

11    between 108 and 120 months.  And you're wanting me to give him

12    no more than 60 months.

13          MR. SKIPPER:  Yes, sir, Your Honor, that's our

14    preference, no more than 72 months.  That's what Mr. Price got.

15    We believe that 60 months is fair.

16          THE COURT:  And you think Mr. Price and he are

17    similar?

18          MR. SKIPPER:  I think Mr. Price is more culpable than

19    Mr. Barnes.

20          THE COURT:  All right.

21          MR. SKIPPER:  That's what this boils down to, is how

22    similarly situated they actually are.  The Government would say

23    he's a lot more than we believe.

24          THE COURT:  You agree?  No?

25          MR. KNELLER:  We do not agree with that, Your Honor.

1    We think that Mr. Barnes is more culpable than Mr. Price was.

2              THE COURT:  Okay.  All right.  So that's what we're

3    going to spend our time deciding that, so get right to it.

4    Don't waste time on all the other stuff, okay?

5              All right.  I'm ready to hear -- Mr. Barnes?

6              THE DEFENDANT:  Yes, sir.

7              THE COURT:  You agree to that restitution we've been

8    talking about?

9              THE DEFENDANT:  Yes, Your Honor.

10             THE COURT:  Okay.  And, Mr. Skipper, I'm ready to

11   hear both argument and anything in mitigation.  And if

12   Mr. Barnes wants to say anything, I'm glad to hear from him,

13   but he doesn't have to.

14             MR. SKIPPER:  If it's okay if he allocutes first, and

15   then I'll just address the Court, Your Honor.

16             THE COURT:  That would be great.

17             Do you want to allocute from there, sir?

18             THE DEFENDANT:  Yes, Your Honor, if that's okay.

19             THE COURT:  Do you want to do it seated?

20             THE DEFENDANT:  Standing is fine, sir.

21             THE COURT:  Okay.  The microphone needs to be a

22   little closer to you so we can hear you, and we'll go from

23   there, okay?

24             THE DEFENDANT:  Thank you.

25             MR. SKIPPER:  Go ahead.

```
 1                    THE COURT:  I'm ready.
 2                    THE DEFENDANT:  I pled guilty because I am guilty.  I
 3   let down my ethics and my morals, and I didn't follow those.  I
 4   let down my faith, my God.
 5                    When I joined the company, I was arrogant and thought
 6   I can change this and get it fixed, and I didn't.  I kept
 7   putting it off, kept putting it off, and finally when I did it
 8   was way too late, so I have nobody to blame but myself.
 9                    THE COURT:  Where are you from?
10                    THE DEFENDANT:  I grew up in Missouri and went to
11   school in Mississippi.
12                    THE COURT:  Where in Missouri?
13                    THE DEFENDANT:  Southeast, Sikeston.
14                    THE COURT:  Springfield?  Is Springfield near there?
15   No?
16                    THE DEFENDANT:  It's down south, but it's on --
17   Springfield is on the west side.  My hometown is on the east
18   side.
19                    THE COURT:  Oh, so you're over near Bentonville in
20   Arkansas?
21                    THE DEFENDANT:  Yes, sir.
22                    THE COURT:  Okay.  All right.  How did you get
23   involved in all this?  Have you always been a salesman?
24                    THE DEFENDANT:  No, I've never been a salesman.  I'm
25   a finance person.  I've been -- I got involved because I was
```

```
 1    invited by Mr. Comu to come and help with some things they were

 2    doing on the finance side, and I said I would.  And he wanted

 3    me to become his CFO, so I agreed to it.  And then after I

 4    found out what they were doing with the 50-percent commissions

 5    instead of 10 percent --

 6              THE COURT:  You should have left right then.

 7              THE DEFENDANT:  I should have left right then, and I

 8    didn't.  And it just continued to manifest and --

 9              THE COURT:  Have you had real jobs in the past --

10              THE DEFENDANT:  Yes, sir.

11              THE COURT:  -- that were legitimate?

12              THE DEFENDANT:  Yes, Your Honor.

13              THE COURT:  What kind of things have you done?

14              THE DEFENDANT:  Well, right out of college I was a

15    national bank examiner.  I worked for the U.S. Treasury

16    Department.

17              THE COURT:  For which department?

18              THE DEFENDANT:  The Treasury Department.

19              THE COURT:  Oh, you did?  Okay.

20              THE DEFENDANT:  The OCC.

21              THE COURT:  I had a good friend that was a bank

22    examiner.  I'm assuming you have a lot of different stories to

23    tell.

24              THE DEFENDANT:  I do, yes, sir.

25              THE COURT:  That was a good job, not a well-paying
```

1   job, correct?

2            THE DEFENDANT:  It was a lot of travel and low-paying

3   job, but I enjoyed it.  I learned a lot.

4            THE COURT:  Okay.

5            THE DEFENDANT:  And I got hired to come down to

6   Houston, Texas, for City Bank, if you remember that old bank.

7            THE COURT:  Yes, sir.

8            THE DEFENDANT:  Hired me to go around to all their

9   banks and be an examiner, review their loans and policies and

10  procedures.  And I did that for three years.  And then I became

11  a loan officer with First City Dallas and moved up here and

12  worked in the main bank here with Mr. Strauss.

13           Then I was a -- I was hired --

14           THE COURT:  Strauss that was later in the

15  administration?

16           THE DEFENDANT:  Ted Strauss.

17           THE COURT:  Ted Strauss.

18           THE DEFENDANT:  The --

19           THE COURT:  Oh, that's the brother.  Okay.

20           THE DEFENDANT:  It's the husband of the mayor.

21           THE COURT:  Yes.

22           THE DEFENDANT:  The -- I got hired away by one of my

23  customers up in Plano called DSC Communications, and I went up

24  there and became vice president of finance and did that for 13

25  years.  It was a public company.

 1              After we sold it to Alcatel, I moved to another
 2   technology company called R.F. Monolithics.  It was started by
 3   several engineers from TI.  And I was vice president and CFO of
 4   that company.
 5              THE COURT:  What happened there?
 6              THE DEFENDANT:  We were a public company, and we sold
 7   to --
 8              THE COURT:  To who?
 9              THE DEFENDANT:  A Japanese firm --
10              THE COURT:  Okay.
11              THE DEFENDANT:  -- called -- I can't remember it now.
12              THE COURT:  That's okay.
13              And then did you make money out of any of these
14   sales?
15              THE DEFENDANT:  Not really.
16              THE COURT:  You didn't have a piece of the pie?
17              THE DEFENDANT:  Not really.  A small -- a small
18   piece.  And then I either held onto it too long or sold it and
19   bought something that wasn't as preferable.  So I never really
20   held onto any money that I created for the companies that I
21   worked for.
22              THE COURT:  What does that mean?  You lived above
23   your means?
24              THE DEFENDANT:  No.  I got greedy, similar to I did
25   in this situation.  You know, I either held it too long or --

1          THE COURT:  What do you mean, held it too long?

2          THE DEFENDANT:  Held the stock too long.  I'm sorry.

3   Held the stock too long.

4          THE COURT:  And it went south?

5          THE DEFENDANT:  And it went south before I got to

6   sell it.

7          THE COURT:  Okay.  Do you have a family?

8          THE DEFENDANT:  Yes, sir.  I did.  I do.

9          THE COURT:  Which is it, "I did" or "I do"?

10         THE DEFENDANT:  Both.

11         THE COURT:  What does that mean?

12         THE DEFENDANT:  I have a 93-year-old mother, and I

13  have a 70-year-old sister.  And I have two sons -- I mean one

14  son, one daughter.  My son is 35 -- 30.  And my daughter is 26.

15         THE COURT:  Are any of them in criminal activity like

16  you?

17         THE DEFENDANT:  No, they're not.

18         THE COURT:  Are they aware of you being in trouble?

19         THE DEFENDANT:  They are.  They've disowned me.  I

20  haven't been able to contact them or --

21         THE COURT:  Your kids haven't come to visit you?

22         THE DEFENDANT:  No.  No, Your Honor.

23         I had -- I was married for 35 years and ruined that

24  relationship.

25         THE COURT:  Before this case or during?

 1          THE DEFENDANT:  Because of it, yes.

 2          THE COURT:  Where's she?

 3          THE DEFENDANT:  She's in Plano.

 4          THE COURT:  Was it worth it?

 5          THE DEFENDANT:  No, Your Honor.

 6          THE COURT:  What else should I know about you?

 7          THE DEFENDANT:  I feel awful that I'm here and I went

 8    through all this, but to me it doesn't really matter; it's the

 9    people that I hurt.  I'm sorry that I did, and I want to make

10    sure that I can repay people if I can.

11          THE COURT:  Okay.  Rarely do people's lives go off

12    the rail at just this juncture.  Did yours go off sometime

13    earlier?  You started drifting into these kind of, you know,

14    activities that first started out just not being quite

15    appropriate, and then you just kept getting worse and worse?

16          THE DEFENDANT:  No, Your Honor.  This is the first

17    time ever being involved in something like this.

18          THE COURT:  Okay.  So everybody there obviously is

19    guilty of something, right?  All of you?

20          THE DEFENDANT:  As part of a conspiracy, yes.

21          THE COURT:  Okay.  And as far as you, where do you

22    see yourself in the scheme of things?  You were the money guy.

23          THE DEFENDANT:  I was the money guy, so I was writing

24    the checks.

25          THE COURT:  So there's nothing you didn't know about.

1          THE DEFENDANT:  Nothing I didn't know about, but I

2     didn't -- I didn't make any money from the commissions or

3     anything.  I just was a salaried employee just like everybody

4     else was.

5          THE COURT:  You just helped some outlaws be bigger

6     outlaws?

7          THE DEFENDANT:  Yes, I did.

8          THE COURT:  Okay.  Okay.  I kind of understand that.

9          THE DEFENDANT:  I've been in county jail for three

10    years now or over three years.

11         THE COURT:  How was that?

12         THE DEFENDANT:  When I was originally arrested, I was

13    accused of getting back and doing it again with other

14    investors, which is not true, but I got accused of that.

15         (Counsel consults with Defendant)

16         THE DEFENDANT:  Violated pretrial release.

17         (Counsel consults with Defendant)

18         THE COURT:  But you got your pretrial release

19    violated.

20         THE DEFENDANT:  Yeah, and I've been in jail ever

21    since.

22         THE COURT:  I understand.  You're just telling me

23    that you didn't do anything wrong and they just yanked your

24    freedom?

25         (Counsel consults with Defendant)

1              THE DEFENDANT:  Yes.

2              (Counsel consults with Defendant)

3              THE DEFENDANT:  Yes, Your Honor.

4              THE COURT:  Okay.  Some other judge made a mistake?

5              THE DEFENDANT:  Yes, Your Honor.

6              THE COURT:  Okay.  The Government is going to tell me

7    a bunch of things here in a minute that if that -- so if that's

8    not true, you better tell me right now.  I am the guy who's

9    going to make --

10             (Counsel consults with Defendant)

11             THE DEFENDANT:  I violated the pretrial release.

12             THE COURT:  Yes.

13             THE DEFENDANT:  I --

14             (Counsel consults with Defendant)

15             THE DEFENDANT:  I did -- I called people that I

16   shouldn't have, other investors, other --

17             THE COURT:  So you can't really -- you're having a

18   hard time in coming completely clean?  That happens all the

19   time.

20             THE DEFENDANT:  Yeah, I was just trying to help

21   people, but, anyway, that's not the way it was provided by the

22   prosecution.

23             THE COURT:  What in the world are you doing calling

24   anybody while you're in jail about this scam?

25             THE DEFENDANT:  I wasn't in jail at the time.

```
 1              THE COURT:  Oh, that's right.  You were at home.
 2              THE DEFENDANT:  I was on pretrial release.
 3              THE COURT:  Okay.  So --
 4              THE DEFENDANT:  People were calling me asking what's
 5   happening, what do I need to do, what --
 6              THE COURT:  So you -- you gave them certain advice or
 7   told them this or that, right?
 8              THE DEFENDANT:  Yes, I did.
 9              THE COURT:  Did you call your lawyer and say, "Man, I
10   wonder what I ought to do now"?
11              THE DEFENDANT:  Actually, my lawyer that I had at the
12   time for the company was putting together --
13              THE COURT:  I'm talking about the lawyer -- your
14   criminal defense lawyer.
15              THE DEFENDANT:  No, I did not.
16              THE COURT:  So you're not just an accountant.  You're
17   also kind of part-time lawyer for yourself.  You don't need any
18   advice?
19              THE DEFENDANT:  No, sir, that's not correct.  I do
20   need advice.
21              THE COURT:  Yeah, you do.  You need a lot of it.
22              I'm just telling you, it doesn't help for you to kind
23   of beat around the bush, "I didn't do anything wrong, and I got
24   my pretrial release revoked."
25              What has it been like in the jail since you got
```

```
 1   revoked?
 2            THE DEFENDANT:  It's been miserable.
 3            THE COURT:  What's your typical day?
 4            THE DEFENDANT:  Get up, read the Bible, watch TV.
 5            THE COURT:  You don't get to exercise?
 6            THE DEFENDANT:  No.  I really can't.
 7            THE COURT:  Okay.  I wouldn't say those are gourmet
 8   meals you're eating either, are they?
 9            THE DEFENDANT:  No, Your Honor.
10            THE COURT:  Right.
11            And you haven't made a good bunch of friends there
12   that you would ever want to spend a weekend with or go into
13   business with?
14            THE DEFENDANT:  No, Your Honor.
15            THE COURT:  Right.
16            Okay.  Anything else you want to tell me about that?
17   Because they're going to blast you here in just a minute.  If
18   you've got anything you want to tell me, you better tell it
19   right now.
20            THE DEFENDANT:  Yeah.  My mother is 93 years old, and
21   I would like to go home and be with her.
22            THE COURT:  Yeah, everybody wants that.  I'm just
23   talking about your culpability and the bad stuff you did.  This
24   is your chance to come clean with everything.
25            THE DEFENDANT:  I was guilty.  I am guilty.  I did
```

```
 1   what everybody says I did in that PSI or whatever was put
 2   together.
 3            THE COURT:  PSR.  Yes, sir.  Yes, sir.
 4            Okay.  All right.  Anything else?
 5            THE DEFENDANT:  No, Your Honor.
 6            THE COURT:  All right.  Mr. Skipper?
 7            MR. SKIPPER:  Your Honor, is that okay if I approach
 8   the lectern?
 9            THE COURT:  Yeah, I want you to.
10            MR. SKIPPER:  It's a little bit higher.
11            THE COURT:  No, it will be -- I'm glad to know you
12   don't have to have glasses.
13            MR. SKIPPER:  Your Honor, the Government is asking
14   the Court to impose a sentence of between 108 and 120 months as
15   for Mr. Barnes.  And as stated, they think that he is -- he,
16   being Mr. Barnes, is more culpable than --
17            THE COURT:  Mr. Price?
18            MR. SKIPPER:  -- Mr. Price, yes, sir.
19            THE COURT:  Well, the difference is, they want at
20   least about three more years than what the most you want me to
21   give him, right?
22            MR. SKIPPER:  That's true, Your Honor.
23            THE COURT:  Okay.
24            MR. SKIPPER:  But at the top end, just to -- if I
25   could start at the end --
```

1              THE DEFENDANT:  Do.

2              MR. SKIPPER:  -- and unravel the onion.

3              THE COURT:  Do.

4              MR. SKIPPER:  In light of what they know now -- this

5     is what I would want to ask the Court to dial in on.  After

6     C.J. Comu is sentenced, after Mervyn Price is sentenced, and we

7     have all that discussion about everything that I'm not going to

8     rehash here today, they have filed a pleading in light of what

9     they know about C.J. Comu being sanctioned by the SEC, being

10    sanctioned by the Wisconsin State Board of Securities, filing a

11    bankruptcy, having through their own words 30 years of fraud in

12    his life, the Government is okay if you were to sentence Buddy

13    Barnes to the same amount of time as C.J. Comu.  That's what's

14    in their pleading, up to ten years.  They would sleep okay with

15    Buddy Barnes getting ten years.  On the bottom end it's nine.

16             And so if you say, okay, here's Mervyn with six,

17    here's C.J. with ten, you split them, at least that's eight at

18    the top end.  They want nine to ten.  Why?  Because they're

19    frustrated because of what he engaged in while he was on

20    pretrial release.  At least that's what I would be frustrated

21    in, but it --

22             THE COURT:  Well, it isn't just that.  I'm sure the

23    Government didn't agree with my sentence.  I don't think they

24    agreed with -- you know, they wanted more.  They're going to

25    say in a minute, "We actually wanted more than 120 months on

1   Comu."  That's what they're going to say, I'm sure.

2              MR. SKIPPER:  I don't know if they would say that.  I

3   mean --

4              THE COURT:  Well, they're going to think it.

5              MR. SKIPPER:  Well, sure, but that's already in the

6   past.  And so I'm just saying when you have your new metric,

7   that's all I'm saying, Your Honor, perhaps it should be dialed

8   back a little bit.  And so now we're focused on the distinction

9   between Mervyn Price and Buddy Barnes.

10              And Mervyn Price, he was one of the initial spokes on

11   the chuck wagon that Comu is up there swatting the horses on.

12   He's one -- he is the initial guy.  He is the initial partner.

13   He is the initial money man.  He's involved in getting the

14   "boots on the ground" guys, Kadish and Green, to pump up the

15   money.  They've got to get those capital investors.

16              The only way Kadish and Green are going to do it,

17   according to Comu and Price, is to get 40 -- 50 percent on the

18   back end, which is clearly why we're here today.  That was a

19   lie.  It was a crime.

20              Buddy comes in later when Mervyn Price has this

21   falling-out with C.J. Comu in September of 2016, as far as on

22   paper with EarthWater, and he does those things.  But even --

23   there's a statement from this guy, Don Frey, F-R-E-Y, when he's

24   interviewed in March of 2020.  And Frey says, "Harley Barnes

25   and Frey met about two years ago in 2017 or 2018 when Comu

1    hired him as EarthWater's CFO.  Frey met Mervyn Price about

2    five years ago.  Price was Comu's partner in finding companies

3    to invest in to promote or companies for sale.  Comu and Price

4    were always together.  Price was introduced as Comu's partner.

5    Comu called Price 'Big Bird.'  They had offices together."

6          So there are distinguishing characteristics between

7    Price and Mr. Barnes.  Restitution amount is lower.  The number

8    of victims is lower.  The loss amount with regard to that

9    repayment is lower.

10          And interestingly enough, it came out on Mr. Price's

11   sentencing, which I thought was interesting, that he had

12   written this plea of guilt to himself in an email in the spring

13   of 2018 after he had already represented to the Government and

14   to you that he had come clean and realized the sins of his

15   involvement, and writes out this email, which the Government

16   had.  And it was basically a roadmap in the prosecution of this

17   entire case.

18          After that time, he off-loaded all of his personal

19   stock to the tune of $183,000.00.  As you know, he wasn't a

20   registered broker, so he had Russ Filippo do that to get 30

21   percent on the back end.

22          Buddy never sold any of his stock.  He never sold it.

23   He never tried to.  He was in on the company.  He wrote all the

24   checks.  He did all those things.  But there are disparities

25   significant between Buddy and Mervyn Price.

1          Even though Mervyn presumably complied with his

2    conditions of release, there are things that he did and more

3    significant structure he was involved in on the front end.

4    Buddy joined later.  That's why, again, his numbers are lower.

5    And he was another spoke that just kept it going.  But he

6    wasn't involved in the initial part of that master plan, so to

7    speak.

8          And so I think in determining whether or not to go

9    all the way up to where they want to go, meaning the

10   Government, nine to ten years, we would ask that they -- Your

11   Honor, you consider those things and the other things I brought

12   up in the motion on his personal background, which I'll just

13   close with that.

14         He didn't mention, Buddy, that both of those kids

15   were adopted by him and his former wife.  Not that you can't

16   adopt someone and make horrible decisions in your life, but

17   it's not going to be the mark of his existence on this planet.

18   And my hat is off to anyone who can adopt one child, much less

19   two.  They were both six months old.  Adopted the little girl

20   first -- pardon me -- the little boy first and then six years

21   later adopted the little girl, who were in need, who did not

22   want to be needed by their parents, like a lot of little

23   innocent children.  And Buddy stepped in.  And that involves a

24   lot, but it involves love.

25         So that is a selfless act despite of where he is

1    right now.  And he'll get back on the road when he gets out of

2    however long he's going to continue being in confinement.

3            But it does say a lot when -- I spoke to him again

4    this morning.  I said, "Have you decided where you want to ask

5    Judge to make a recommendation?  Because before we were talking

6    about Springfield.  It's a medical facility as well.  You know,

7    you can get some treatment there.  And you've got guarantees in

8    Springfield, because you've got Beverly and you've got your

9    mom.  At least Beverly can drive over and fill you in on your

10   mother's health.  But you've got nothing at Seagoville except

11   the hope that your daughter and son, you might be able to

12   rekindle this thing, you know, before you get out."

13           And we -- Keith and Johnny and I, we spent some time

14   trying to do this.  It's important.  And that's life.  And

15   Buddy caused all those pains with those kids.

16           But when you're measuring somebody and sizing them

17   up, in determining a fair and appropriate sentence under the

18   3553(a) factors, despite all of this evidence, I do think it's

19   important for the Court to understand that and what he's trying

20   to do to mend all the things that he completely broke by

21   himself.

22           And that's all we have, Your Honor.

23           THE COURT:  All right.  Government?  Mr. Kneller,

24   formerly Mr. Fenton.

25           MR. KNELLER:  Now Mr. Kneller, Your Honor.

1          Your Honor, I would like to take a moment to talk to

2    the Court about what Mr. Barnes has actually done in his role

3    with the company.

4          THE COURT:  Okay.

5          MR. KNELLER:  It's been suggested that perhaps his

6    role is more passive and it was just related to the money, but

7    that's just not the case, Your Honor.  He took a hands-on role

8    with Mr. Comu in promoting the fraud to investors as part of

9    the scheme to steal the investors' money.  This is extensive.

10         Prior to Mr. Barnes joining the conspiracy, the FDA

11   and the Texas Department of Health reached out to the bottling

12   company and said, "You can't send this bottling -- these

13   shipments out with all these claims on your website."  Those

14   claims included serious concerns from the FDA about

15   unsubstantiated claims regarding numerous health treatments,

16   including reducing blood pressure, healing burns, treating open

17   wounds, having anti-microbial and fungicide properties.

18         The company was on notice that it couldn't make these

19   unsubstantiated health claims.  But when Mr. Barnes was

20   involved with Mr. Comu, they ignored all that.

21         What are some of the things that they told investors?

22   Well, Mr. Barnes promoted with Mr. Comu an event for investors

23   that Mr. Barnes in Exhibit 7 writes an email.  He says, "We

24   should call it the fountain of youth, the miracle of minerals,

25   where we have the scientist Dr. Norbert Chirase present on the

 1  health benefits of this product."

 2          Exhibit 8 of the Government's submission, Mr. Barnes

 3  brags to Mr. Comu how he's promoting an article that lists

 4  numerous health benefits, such as that these minerals that are

 5  in their water have 100 percent success rate of preventing

 6  tumors, it treats normally incurable hemorrhagic fever.  It's a

 7  powerful anti-aging therapy.

 8          Exhibits 9 and -- Exhibits 9 and 10 --

 9          THE COURT:  So I'm assuming you're going to go

10  through some more of these.

11          What he did was, he pushed these qualities of this

12  product that were unproven and said, "This is what we ought to

13  say, it's this and that and this and that"?

14          MR. KNELLER:  Yes, Your Honor.  And just as it went

15  on, Mr. Barnes' role in it became more and more involved, and

16  it became more outlandish.

17          I won't go through all of them for the Court, but

18  just to point out, Mr. Barnes and Mr. Comu were sending out

19  testimonials about how the water was used and cured a patient

20  of leukemia.

21          Mr. Barnes' knowledge of the fraud was extensive.  He

22  was the one who cut the checks for 50 percent to the stock

23  promoters.  He's the one that signed the checks.  He was the

24  one that was helping promote the outlandish claims about

25  leukemia cures, about there was an 80-million-year-old mineral

1    well that they -- in a secret location that they found these

2    minerals that they put in their water.  Mr. Barnes knew that

3    that's not the case.  He knew that the minerals were bought

4    from Dr. Chirase, who was here at Mr. Comu's sentencing

5    hearing, who has a -- he has a company in Amarillo.  That's

6    where they got the minerals, not from the 80-million-year-old

7    secret mine that they claimed in materials, that Mr. Barnes

8    edited and drafted and submitted.

9            His role in the entire project was extensive, going

10   back to 2015, when he was appointed interim CFO of the company.

11           He was there during the course of time when the

12   company raised more than $10 million from investor funds based

13   on these lies, stealing investor funds, giving 50 percent to

14   the stock promoters and not using the money as they claim that

15   they were to investors.

16           2019, the Government indicted Mr. Barnes.  And what

17   did he do?  Immediately upon getting out of pretrial release,

18   he entered into a conspiracy with his girlfriend, Beth DeGroot.

19   She got him a new cell phone.  They created new email

20   addresses.  And they immediately began reaching out to existing

21   investors who Mr. Barnes knew had already invested hundreds of

22   thousands of dollars based on a fraud to try and convince them

23   to invest more money to create a new shell company that would

24   then sell the product and continue the fraud.

25           Mr. Barnes knew the product was a fraud.  He knew

1    that the setup of the company was a fraud.  And he was

2    instrumental in perpetrating the fraud.  And when he was

3    caught, he tried to double-down.  He tried to do it again.  He

4    made numerous lies in order to get the payroll company to pay

5    him and Ms. DeGroot payroll after the company had shuttered.

6         Mr. Barnes still today cannot admit his role or his

7    culpability in this extensive scheme where he was responsible

8    or instrumental in extracting more than $10 million from

9    vulnerable, elderly victims who he knew were being targeted

10   again and again through this extensive plan that he and

11   Mr. Comu perpetuated.

12        And, Your Honor, it's for those reasons and

13   Mr. Barnes' continued activities, his knowledge of the fraud,

14   that we think distinguishes him from Mr. Price.  Mr. Price was

15   not involved after he was indicted in continuing to perpetuate

16   the fraud.

17        And for those reasons, we believe that 108 to 120

18   months is an appropriate sentence for Mr. Barnes.

19        THE COURT:  Thank you.

20        Anything else, Mr. Skipper?

21        MR. SKIPPER:  Your Honor, just to counter what the

22   Government keeps harping on with these sentencing memorandum

23   exhibits, the first five or six, they don't have Buddy's name

24   on there.  It's with Mervyn Price and C.J. Comu, before Buddy

25   even entered into this group conspiracy.

1          This push by Mr. Fenton and his able colleague here

2    today that keeps talking about Barnes and Comu sent out false

3    testimonials is just simply not true.  Their own exhibits

4    completely say the opposite.

5          This Exhibit Number 9, I believe, Mr. Kneller keeps

6    referring to, it's an email C.J. presumably now writes to

7    himself.  They're saying this is some false person saying the

8    health benefits of this.  And then C.J. sends it to Buddy.  And

9    C.J. says, "Below is the format of what I sent to a very VIP

10   list."  Unless I have not received something yet from the

11   Government where Buddy is forwarding this on to someone else.

12         Buddy believed in it, okay?  It's black water.

13   It's -- I've tried it.  It doesn't look very palatable.  It is

14   what it is.

15         But he's not pushing out what C.J. Comu is telling

16   him.  He's relying on C.J. Comu.  Much like C.J. Comu didn't

17   say, "Hey, Buddy, by the way, I've already been stripped down

18   by the SEC.  I've already had an injunction issued on me by the

19   State of Wisconsin Board of Securities."

20         There are differences.

21         Mervyn Price knew these things.  And he knew, Mervyn

22   Price, that the product was a fraud.

23         These -- the very emails the Government wants this

24   Court to rely on to smack Buddy substantiates this.

25         The emails here -- Mervyn Price is talking about,

1   "Whoa, let's not -- let's make sure these documents don't
2   really show the snake oil."  He uses that term.  Buddy never
3   uses those terms when he joins.  He's promoting the product.
4           He kept it.  Is that something that a guy thinks that
5   he's pushing this fake black water if he keeps it and eats the
6   $250,000.00 worth of stock?  No.  Mervyn Price did it.  He did
7   it knowingly, and he pushed the fraud.
8           There are differences.  And, again, the Government
9   does not want to acknowledge that their very exhibits establish
10  that.
11          Thank you.
12          THE COURT:  Mr. Kneller?
13          MR. KNELLER:  I'll be very brief, Your Honor.
14          Counsel just directed the Court to Exhibit 9 and
15  suggesting that it was Comu who drafted these materials about
16  leukemia.
17          Exhibit 10 is an email going out to investors in
18  which Mr. Comu and Mr. Barnes are copied that has the
19  testimonial about leukemia in it.  Mr. Barnes knew.  Mr. Barnes
20  knew that these materials were being sent to investors.
21          And with respect to his role, in Exhibit 18, Buddy
22  Barnes is responding to an investor who is inquiring why the
23  company has now changed course in 2018 to promote a multilevel
24  marketing scheme instead of what had been told to the investor,
25  the IPO, or the buyout, which is how they would make the money.

 1  Mr. Barnes perpetuates the lie that there's still an IPO or a
 2  buyout on the horizon.
 3          And what is the investor reaching out to Mr. Barnes
 4  about?  It's about the memo to shareholders about this change
 5  in the strategy of the company.
 6          And what is Mr. Barnes and Mr. Comu saying in this
 7  memo?  They're saying that we're launching on April 4th --
 8  April 14, 2018, our new program.  Why?  Because in scripture,
 9  John 4:14, our launch date, April -- 4-14, tells us, "But
10  whoever drinks the water I give them will never thirst.
11  Indeed, the water I give them will become in them a spring of
12  water welling up to internal life."
13          That's their pitch to why they're selling this
14  water -- why their launch date is on April 14th.  That is now
15  the signature line of Mr. Barnes' emails from that date
16  forward, as in Exhibit 18.
17          Mr. Barnes was involved with this fraud, and he was
18  lockstep with Mr. Comu in perpetuating those lies.
19          THE COURT:  Okay.  Anything else?
20          MR. SKIPPER:  He was involved in the fraud, Your
21  Honor.  That's why we're here.  He pled guilty to kicking out
22  50 percent.  He wasn't involved in what the Government's theory
23  is and what this Court said over and over again about pushing a
24  dirty product.  He relied on the man who testified here in this
25  court in front of C.J. Comu at his sentencing hearing.  He

1     relied on what C.J. Comu was emailing.

2              This email, again, it's -- Your Honor, they submitted

3     these documents, and he's representing to you that Buddy Barnes

4     sent this email out.  It's sent -- Exhibit 10, unless we want

5     to go to Exhibit 11, from Chhitiz -- Chhitiz something Basnet.

6     And Buddy is copied on that.

7              He has no reason -- C.J. Comu tells him, yeah, this

8     is working.  He drinks this stuff.

9              He's not indicted for pushing nor did he plead guilty

10    of fraudulent product.  And the Court knows that.  We're here

11    for doing something completely noncomplex and unsophisticated

12    but for the 10 percent material misrepresentation and these

13    guys being thieves, taking either $1.00 or $12 million.  That

14    was a lie.  But now we're back on the black water.  And those

15    are two different things.  And Mervyn Price was much more

16    involved.  He was a much thicker spoke in this wheel than Buddy

17    Barnes.

18             And that's all.  I'll sit down, Your Honor.

19             THE COURT:  Okay.  Mr. Kneller, anything else?

20             MR. KNELLER:  Nothing further, Your Honor.

21             THE COURT:  Okay.  All right.  So I'm considering

22    where I sentenced the other individuals, looking at the

23    guidelines and the factors of 3553(a), and considering what

24    I've heard today and from everybody involved, and it is the

25    judgment of the Court you be sentenced to the custody of the

```
 1    United States Bureau of Prisons for a term of 70 months.
 2              I'm going to give you credit for the time you've
 3    served.
 4              I'll recommend -- Missouri?
 5              MR. SKIPPER:  I'm sorry, Your Honor.
 6              (Counsel consults with Defendant)
 7              MR. SKIPPER:  He would request Seagoville, Your
 8    Honor.
 9              THE COURT:  All right.  Then I'll put down
10    Seagoville.  If you change your mind, let me know.
11              And you'll need to be on supervised release.
12              And you'll need to pay the restitution of the $10
13    million amount that I mentioned earlier.
14              And this is -- this is on all counts.
15              I'm not ordering a fine, only because I would rather
16    you pay the restitution.  And we're taking that money you've
17    already surrendered for that.
18              You'll need to pay -- your special assessment is
19    $2,200.00 over the 22 counts, $100.00 for each count.
20              And your supervised release will be for two years on
21    all those counts, and they will run concurrently.
22              And I adopt the terms of supervision set forth in
23    Miscellaneous Order 64 and outlined in Part G of the
24    presentence report except as modified or supplemented by any
25    facts set forth in any addendum and any facts found by the
```

```
 1   Court during this hearing.  And you shall comply with these
 2   conditions during the term of supervision.
 3            I do dismiss -- oh, and I did take into account the
 4   letters that I had in support -- let's see -- the original
 5   indictment as to you.
 6            I think that's it.
 7            Let's see.  Is there anything else from the
 8   Government, Mr. Kneller?
 9            MR. KNELLER:  Nothing else from the Government, Your
10   Honor.
11            THE COURT:  Anything from you, Mr. Skipper?
12            MR. SKIPPER:  No, Your Honor.  Thank you.
13            THE COURT:  Okay.  Off the record.
14            (Discussion off the record)
15            (Hearing adjourned)
16
17
18
19
20
21
22
23
24
25
```

1                           INDEX

2      Court's ruling.......................................... 34

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        I, TODD ANDERSON, United States Court Reporter for the

2    United States District Court in and for the Northern District

3    of Texas, Dallas Division, hereby certify that the above and

4    foregoing contains a true and correct transcription of the

5    proceedings in the above entitled and numbered cause.

6        WITNESS MY HAND on this 3rd day of March, 2023.

7

8

9
                              /s/Todd Anderson
10                            TODD ANDERSON, RMR, CRR
                              United States Court Reporter
11                            1100 Commerce St., Rm. 1625
                              Dallas, Texas  75242
12                            (214) 753-2170

13

14

15

16

17

18

19

20

21

22

23

24

25